1
2   Randal Jerome Dalavai
    14332 Mountain Road
3   Poway, CA  92064
    Email: randaljerome@gmail.com
4   Tel: (872) 232-0713

5   Plaintiff, In Pro Se

6



7           UNITED STATES DISTRICT COURT

8           SOUTHERN DISTRICT OF CALIFORNIA

9   **RANDAL JEROME DALAVAI,**        Case No.:  **'22 CV 1471 CAB WVG**

10

11                        Plaintiff    **COMPLAINT**

12  V.

13  **UNIVERSITY OF CALIFORNIA**
14  **SAN DIEGO HEALTH, AKA UC**
    **SAN DIEGO HEALTH, Hospital,**
15  **entity unknown; INLAND VALLEY**
16  **MEDICAL CENTER, Hospital; DR.**
17  **TIMOTHY M. FERNANDES, M.D.;**
    **DR. NATALIA CHAVEZ**
18  **STEWART, M.D., an Individual; DR.**
19  **ALEX DAVILA, M.D., an Individual;**
20  **DR. REUBEN LAKSHMANAN, M.D.**
    **an Individual; DR. NORMAN ORR,**
21  **M.D. an Individual; DR. BENJAMIN**
22  **TSAI, M.D. an Individual; DR.**
    **MOHAMMED SUHAIL, M.D., an**
23  **Individual; DR. DOUGLAS A.**
24  **GREEN, M.D., an Individual; DR.**
    **JOHN C. KIM, M.D., an Individual;**
25  **DR. STEVEN C. HOWE, M.D., an**
26  **Individual; DR. STEFAN SEIN, M.D.,**
27
28
                              1

1  an Individual; DR. ALEX KRISTINE
2  PEARCE, M.D., an Individual; DR.
3  GORDON LAP-KAY YUNG, M.D.,
   an Individual; DR. JAVIER R. RIOS,
4  M.D., an Individual; DR. PATRICIA
5  S. JUANG, M.D., an Individual; DR.
6  KELSEY ANN LUOMA, M.D., an
   Individual; DR. GREGORY DAVID
7  MIDDLETON, M.D., an Individual;
8  DR. ANNE N. COWELL, M.D., an
9  Individual; DR. JEJO D. KOOLA,
   M.D., an Individual; DR. ANNIE N.
10 COWELL, M.D., an Individual; DR.
11 KIRA ANNE SKAVINSKI, DO, an
12 Individual; DR. ERIC JON
   MLODZINSKI, M.D., an Individual;
13 AND DR. NAVEEN GUPTA, M.D.,
14 an Individual; DR. DANIEL CALAC,
15 M.D., an Individual; DR.
   LAURENCE H. BOGGELN, M.D. an
16 Individual; DR. JENNIFER M.
17 QUARTAROLO M.D., an Individual;
18 DR. ABHISHEK GADRE, M.D. an
19 Individual; DR. MICHELLE PEI
   ZHANG, M.D., an Individual; DR.
20 JASWINDER P. BAJWA, M.D. an
21 Individual; AND DR. SHERRY
22 SHUYAN ZHANG, M.D.,  an
   Individual; DOE, 1st Physician
23 certifying Terminal illness at
24 Elizabeth Hospice.,  an Individual;
25 DOE, 2nd Physician certifying
26 Terminal illness at Elizabeth Hospice.,
   an Individual
27
28                                    2

Defendant(s)

## **STATEMENT OF CLAIM**

1.     The cause of action in this case for violation of **42 U.S.C. 1395dd.** The Hospitals and Medical Professionals listed as Defendants violated the code **42 U.S.C. 1395dd.**

2.     On September 1, 2020, Decedent Geetha Dalavai was dropped off at the Inland Valley Medical Center Emergency Room in a personal vehicle by her son Randal Dalavai. Geetha Dalavai walked into the Emergency Room to seek immediate medical attention to avoid severe harm. The immediate medical attention included Lung Biopsy and Pulmonary Function Test which were medically necessary and in the absence of which would be expected to result in placing the health of Geetha Dalavai, in serious jeopardy, the significant impairment to bodily functions, and serious dysfunction of Geetha Dalavai's bodily organs and parts.

3.     The Inland Valley Medical Center Emergency Room and the attending Physicians were expected to evaluate if the hospital has within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition in order to meet their obligation under **§ 1395dd (b)(1)(A).**

4.     The Inland Valley Medical Center Emergency Room and the attending Physician did not seek or attempt to transfer Geetha Dalavai to another medical facility in accordance with **§ 1395dd (c)** to meet their obligation under **§ 1395dd (b)(1)(B).**

3

5.     The Inland Valley Medical Center Emergency Room and the attending Physician were fully aware that Geetha Dalavai was suffering from Rheumatoid Arthritis, and she was taking Humira (adalimumab) which is an immunosuppressant medicine that has lowered the ability of Geetha Dalavai's immune system to fight infections and would make an infection worse. The hospital and treating physician were in the full knowledge that Geetha Dalavai's shortness of breath and hypoxia manifested for at least three weeks before she showed up in the Emergency Room. A lung biopsy was medically necessary and failure to immediately perform the lung biopsy and provide appropriate treatment could risk the progression of Geetha Dalavai's emergency medical condition to a point where performing a lung biopsy or any surgery would require Geetha Dalavai to be transferred to a Higher level of care in accordance with § **1395dd (c)** to meet their obligation under § **1395dd (b)(1)(b).**

6.     Inland Valley Medical Center and the attending Physicians treated Geetha Dalavai for 16 days before recommending Cardiothoracic Surgery evaluation or a lung biopsy. The Cardiothoracic surgeon stated that the Decedent needed to be transferred to a Higher Level of Care at which point the case management at Inland Valley Medical Center struggled for several days to secure a tertiary center. On September 16, 2020, Decedent, Geetha Dalavai was transferred to Jacobs Medical Center facility at the University of California San Diego Health in accordance with § **1395dd (c)** to meet their obligation under **1395dd (b)(1)(B).**

7.     The expectation of transfer to the University of California San Diego Health was to get a higher level of care as per Cardiothoracic Surgeon at Inland Valley Medical Center and get treatment or, in good faith, to stabilize her emergency medical condition. University of California San Diego Health,

4

however, evaluated Decedent, Geetha Dalavai for Lung Transplant which may not be medically necessary at all at this point. University of California San Diego Health evaluated her for a Lung transplant to justify the transfer from Inland Valley Medical Center and show that transfer was appropriate in accordance with § 1395dd (c).

8.     On October 1, 2020, Defendant Dr. Timothy M. Fernandes, M.D., discussed with Decedent, Geetha Dalavai and Plaintiff Randal Dalavai that Geetha Dalavai is not a transplant candidate at UCSD, UCLA, Cedars, and USC. Dr. Fernandes, M.D also said that Decedent's RA-ILD (Rheumatoid arthritis-associated interstitial lung disease) has progressed despite pulse steroids and Cytoxan. She has worsening diffuse alveolar damage and new pneumomediastinum. She remains on a high-flow nasal cannula. Since she has no further options for treatment and she is stuck in the ICU due to high flow oxygen needs, Defendant Dr. Timothy M. Fernandes, M.D., recommended that Geetha Dalavai enroll in hospice and goals of care changed to comfort measures only.

## 1st CAUSE OF ACTION

### Violation of 42 U.S.C. § 1395dd Emergency Medical Treatment and Active Labor Act (EMTALA)

9.     Defendant Dr. Timothy M. Fernandes, M.D. informed that Geetha Dalavai is not a candidate for a Lung transplant at USC and her RA-ILD has progressed. Dr. Timothy M. Fernandes, M.D., University of California San Diego Health, and the attending Physicians at University of California San Diego Health violated **42 U.S.C. 1395dd. (b)** by not providing and preventing any further necessary stabilizing treatment for emergency medical conditions that Decedent

Geetha Dalavai had. Defendant Dr. Timothy M. Fernandes, M.D did not transfer Geetha Dalavai to another medical facility in accordance with **§ 1395dd (c)** to meet their obligation under **§ 1395dd (b)(1)(B).**

## 2nd CAUSE OF ACTION

### Violation of 42 U.S.C. § 1395dd Emergency Medical Treatment and Active Labor Act (EMTALA)

10.   The University of California San Diego Health did not meet its obligation under **42 U.S.C. 1395dd.(b)(2)** by not taking any reasonable steps to secure Geetha Dalavai's written informed consent to refuse such examination and treatment that may be available according to **42 U.S.C. 1395dd.** University of California San Diego Health violated  **42 U.S.C. 1395dd. (b)** by not providing necessary stabilizing treatment for emergency medical conditions that Geetha Dalavai had and did not meet its obligation under **§ 1395dd.(C)(2)** by prematurely transferring Geetha Dalavai to Hospice Care which was medically not necessary.


11.   The University of California San Diego Health did not meet its obligations under **42 U.S.C. 1395dd. (c) (2)** while transferring the patient to Elizabeth Hospice.

### 3rd CAUSE OF ACTION

### Violation of 42 U.S.C. § 1395dd Emergency Medical Treatment and Active Labor Act (EMTALA)

12.   Defendant, Dr. Jennifer M. Quartarolo did not meet her obligations under **42 U.S.C. 1395dd. (c) (2)** while transferring and discharging the patient to Elizabeth Hospice. Dr. Jennifer M. Quartarolo violated **42 U.S.C. 1395dd. (b)** by not providing and preventing any further necessary stabilizing treatment for

emergency medical conditions that Decedent Geetha Dalavai had.  **Defendant Dr. Jennifer M. Quartarolo** did not seek or attempt to transfer Decedent Geetha Dalavai to another medical facility in accordance with **§ 1395dd (c)** to meet their obligation under **§ 1395dd (b)(1)(B).**

### 4th CAUSE OF ACTION

### Violation of 42 U.S.C. § 1395dd Emergency Medical Treatment and Active Labor Act (EMTALA)

13.    The Decedent Geetha Dalavai who was not stabilized for her Emergency Medical Condition was transferred to Elizabeth Hospice. The Physicians at Elizabeth Hospital certified Decedent as terminally ill while she was not terminally ill.

14.    The two physicians **Daniel C. Calac, M.D.** and **Laurence H. Boggeln, M.D.** who certified Geetha Dalavai at Elizabeth Hospice as terminally ill had an obligation under **42 U.S.C. 1395dd (b) (1) (B)** to transfer her to a facility that was able to stabilize Decedent Geetha Dalavai's Emergency Medical Condition. The Physicians at Elizabeth Hospice violated **42 U.S.C. 1395dd.**

### EMTALA Framework

### § 1395dd. Examination and treatment for emergency medical conditions and women in labor

15.    **(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an

appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

**(b)** **Necessary stabilizing treatment for emergency medical conditions and labor**

**(1)** **In general** If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either— (a) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (b) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

**(2)** **Refusal to consent to treatment** A hospital is deemed to meet the requirement of paragraph (1)(a) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all

reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

**(3)**      **Refusal to consent to transfer** A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) of this section and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c)**      **Restricting transfers until individual stabilized**

**(1)**      **Rule** If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless— **(a)(i) the individual** (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility, **(ii) a physician** (within the meaning of section 1395x(r)(1) of this title) has signed a certification that 1 based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another

9

medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or **(iii) if a physician** is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and **(b) the transfer** is an appropriate transfer (within the meaning of paragraph (2)) to that facility. A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2)   **Appropriate transfer** an appropriate transfer to a medical facility is a transfer—

(a)   **in which** the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(b)   **in which** the receiving facility— **(i) has available** space and qualified personnel for the treatment of the individual, and **(ii) has agreed** to accept transfer of the individual and to provide appropriate medical treatment;

(c)   **in which** the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the

10

emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(a), and the name and address of any on-call physician (described in subsection (d)(1)(c) of this section) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

**(d)**   **in which** the transfer is affected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

**(e)**   **which** meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

**(d)**   **Enforcement (1) Civil money penalties**

**(a) A participating hospital** that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation. The provisions of section 1320a–7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions

11

apply with respect to a penalty or proceeding under section 1320a–7a(a) of this title.

(b)     **Subject to** subparagraph **(c), any physician** who is responsible for the examination, treatment, or transfer of an individual in a participating hospital, including a physician on-call for the care of such an individual, and who negligently violates a requirement of this section, including a physician who— **(i) signs a certification** under subsection (c)(1)(A) of this section that the medical benefits reasonably to be expected from a transfer to another facility outweigh the risks associated with the transfer, if the physician knew or should have known that the benefits did not outweigh the risks, or **(ii) misrepresents an individual's condition or other information**, including a hospital's obligations under this section, is subject to a civil money penalty of not more than $50,000 for each such violation and, if the violation is gross and flagrant or is repeated, to exclusion from participation in this subchapter and State health care programs. The provisions of section 1320a–7a of this title (other than the first and second sentences of subsection (a) and subsection (b) shall apply to a civil money penalty and exclusion under this subparagraph in the same manner as such provisions apply with respect to a penalty, exclusion, or proceeding under section 1320a–7a(a) of this title. (c) If, after an initial examination, a physician determines that the individual requires the services of a physician listed by the hospital on its list of on-call physicians (required to be

12

maintained under section 1395cc(a)(1)(I) of this title) and notifies the on-call physician and the on-call physician fails or refuses to appear within a reasonable period of time, and the physician orders the transfer of the individual because the physician determines that without the services of the on-call physician the benefits of transfer outweigh the risks of transfer, the physician authorizing the transfer shall not be subject to a penalty under subparagraph (b). However, the previous sentence shall not apply to the hospital or to the on-call physician who failed or refused to appear.

**(2)** **Civil enforcement (a) Personal harm**

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate. **(b) Financial loss** to other medical facility Any medical facility that suffers a financial loss as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for financial loss, under the law of the State in which the hospital is located, and such equitable relief as is appropriate. **(c) Limitations on actions** No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

13

**(3)**   **Consultation with peer review organizations** In considering allegations of violations of the requirements of this section in imposing sanctions under paragraph (1) or in terminating a hospital's participation under this subchapter, the Secretary shall request the appropriate utilization and quality control peer review organization (with a contract under part B of subchapter XI of this chapter) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under paragraph (1) and shall provide a period of at least 60 days for such review. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall also request such a review before making a compliance determination as part of the process of terminating a hospital's participation under this subchapter for violations related to the appropriateness of a medical screening examination, stabilizing treatment, or an appropriate transfer as required by this section, and shall provide a period of 5 days for such review. The Secretary shall provide a copy of the organization's report to the hospital or physician consistent with confidentiality requirements imposed on the organization under such part B. (4) Notice upon closing an investigation The Secretary shall establish a procedure to notify hospitals and physicians when an investigation under

14

this section is closed. (e) Definitions In this section: (1) The term ''emergency medical condition'' means— (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in— (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part; or (b) with respect to a pregnant woman who is having contractions— (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child. (2) The term ''participating hospital'' means a hospital that has entered into a provider agreement under section 1395cc of this title. (3)(a) The term ''to stabilize'' means, with respect to an emergency medical condition described in paragraph (1)(a), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(b), to deliver (including the placenta). (b) The term ''stabilized'' means, with respect to an emergency medical condition described in paragraph (1)(a), that no

material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1)(b), that the woman has delivered (including the placenta). (4) The term ''transfer'' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (a) has been declared dead, or (b) leaves the facility without the permission of any such person. (5) The term ''hospital'' includes a critical access hospital (as defined in section 1395x(mm)(1) of this title). (f) Preemption The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section. (g) Nondiscrimination A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual. (h) No delay in examination or treatment A participating hospital may not delay provision of an appropriate medical

16

screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status. (i) Whistleblower protections A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(a)(iii) of this section or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

## PARTIES

16.   At all times herein mentioned, Randal Dalavai ("Randal Dalavai") was an individual residing in the county of Riverside, California. Randal Dalavai was and is the son of Decedent Geetha Dalavai.

17.   Plaintiff is informed, believes, and based thereon alleges, that the University of California San Diego Medical Center ("UCSD Medical Center") aka UC San Diego Health is a medical facility licensed to do business and doing business in the County of San Diego, California.

18.   Plaintiff is informed, believes, and based thereon alleges, that Inland Valley Medical Center is a medical facility licensed to do business and doing business in the County of Riverside, California.

19.   Plaintiff is informed, believes, and based thereon alleges, that Dr. Javier Rios, M.D. ("Dr. Rios") is a physician residing in, and doing business in the County of Riverside, California.

17

20.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Natalia Chavez Stewart, M.D. ("Dr. Stewart") is a physician residing in, and doing business in the County of Riverside, California.

21.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Alex Davila, M.D. ("Dr. Avila") is a physician residing in, and doing business in the County of Riverside, California.

23.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Reuben Lakshmanan, M.D. ("Dr. Lakshmanan") is a physician residing in, and doing business in the County of Riverside, California.

24.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Norman Orr, M.D. ("Dr. Orr") is a physician residing in, and doing business in the County of Riverside, California.

25.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Benjamin J. Tsai, M.D. ("Dr. Tsai") is a physician residing in, and doing business in the County of Riverside, California.

26.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Mohammed Suhail, M.D. ("Dr. Suhail") is a physician residing in, and doing business in the County of Riverside, California.

27.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Douglas A. Green, M.D. ("Dr. Green") is a physician residing in, and doing business in the County of Riverside, California.

28.    Plaintiff is informed, believes, and based thereon alleges, that Dr. Steven C. Howe, M.D. ("Dr. Howe") is a physician residing in, and doing business in the County of Riverside, California.

18

29.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Stefan Sein, M.D. ("Dr. Sein") is a physician residing in, and doing business in the County of San Diego, California.

30.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Alex Kristine Pearce, M.D. ("Dr. Pearce") is a physician residing in, and doing business in the County of San Diego, California.

31.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Gordon Lap-Kay Yung, M.D. ("Dr. Yung") is a physician residing in, and doing business in the County of San Diego, California.

32.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Patricia S. Juang, M.D. ("Dr. Juang") is a physician residing in, and doing business in the County of San Diego, California.

33.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Kelsey Ann Luoma, M.D. ("Dr. Luoma") is a physician residing in, and doing business in the County of San Diego, California.

34.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Gregory David Middleton, M.D. ("Dr. Middleton") is a physician residing in, and doing business in the County of San Diego, California.

35.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Annie N. Cowell, M.D. ("Dr. Cowell") is a physician residing in, and doing business in the County of San Diego, California.

36.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Kira Anne Skavinski, Do. ("Dr. Skavinski") is a physician residing in, and doing business in the County of San Diego, California.

37.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Eric Mlodzinski, M.D. ("Dr. Mlodzinski") is a physician residing in, and doing business in the County of San Diego, California.

38.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Naveen Gupta, M.D. ("Dr. Gupta") is a physician residing in, and doing business in the County of San Diego, California.

39.     Plaintiff is informed, believes, and based thereon alleges, that Dr. ; Dr. Daniel Calac, M.D. ("Dr. Calac") is a physician residing in, and doing business in the County of San Diego, California.

40.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Laurence H. Boggeln, M.D. ("Dr. Boggeln") is a physician residing in, and doing business in the County of San Diego, California.

41.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Jennifer M. Quartarolo, M.D. ("Dr. Quartarolo") is a physician residing in, and doing business in the County of San Diego, California.

42.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Abhishek Gadre, M.D. ("Dr. Gadre") is a physician residing in, and doing business in the County of San Diego, California.

43.     Plaintiff is informed, believes, and based thereon alleges, that  Dr. Michelle Pei Zhang, M.D. ("Dr. Zhang") is a physician residing in, and doing business in the County of San Diego, California.

44.     Plaintiff is informed, believes, and based thereon alleges, that Dr. Jaswinder P. Bajwa, M.D. ("Dr. Bajwa") is a physician residing in, and doing business in the County of San Diego, California.

45.   Plaintiff is informed, believes, and based thereon alleges, that Dr. Sherry Shuyan Zhang, M.D., ("Dr. Zhang") is a physician residing in, and doing business in the County of San Diego, California.

## JURISDICTION AND VENUE

46.   The is a civil action arising under laws of the United States, this court has subject-matter jurisdiction pursuant to 28 U.S.C 1331. Because list of Defendants resides within the Southern District of California, venue is proper under 28 U.S. Code § 1391(b)(1).

## REQUEST FOR RELIEF

**Wherefore, Plaintiff respectfully requests that this Court:**

   a. Assert jurisdiction over this matter;

   b. Issue a declaratory judgment in favor of Plaintiff;

   c. Enforce Civil money penalties in accordance with **42 U.S.C. 1395dd. (d) (1)**;

   d. Civil enforcement in accordance with **42 U.S.C. 1395dd. (d) (2)**;

   e. For legal interest on judgment from the filing of this complaint to the date of judgment.

## DEMAND FOR JURY TRIAL

Plaintiff is requesting a trial by jury pursuant to FRCP, Rule 38

I declare under penalty of perjury that the foregoing is true and correct.

09/28/2022
**Date**

Randal Dalavai (Sep 29, 2022 13:21 PDT)

**Randal Jerome Dalavai**
**Plaintiff, In Pro Se**

21